1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Bruce Peck,

      Plaintiff

v.

City of Las Vegas,

      Defendant

2:15-cv-02070-JAD-PAL

**Order Granting in Part and Denying in Part Motion for Temporary Injunctive Relief, Denying Ex Parte Motion for Leave to File an Amended Complaint, and Resolving Motion to Proceed**

[ECF No. 7, 70, 71]

Busker Bruce Peck sues the City of Las Vegas under 28 U.S.C. § 1983 alleging that portions of the prior and current ordinances that govern the Fremont Street pedestrian mall violate his First and Fourteenth Amendment rights.[1]  He seeks a temporary restraining order or a preliminary injunction preventing the City from enforcing the challenged provisions,[2] and he asks for leave to file a second amended complaint.[3]

    Peck challenges the provisions that: (1) prohibit street performances within certain areas of the mall; (2) limit the volume of sound that street performers can emit; (3) designate certain spots as the only locations where street performances are permitted on the mall from 3 p.m. to 1 a.m.; (4) authorize the establishment of a lottery system for street performers to reserve the designated performance zones; and (5) require street performers to register with the City after first using a designated performance zone.  I find that Peck does not have standing to challenge the sound restriction, but he has shown that he is entitled to relief from the registration requirement because it operates as an unenforceable prior restraint on speech.  And although

---

[1] ECF No. 20.  Peck also sued several individual defendants and "the Officers of the Fremont Street Experience, LLC," but all claims against them have been dismissed.  ECF No. 69.

[2] ECF No. 7.  Peck originally moved for temporary injunctive relief on an ex parte basis but I denied the without-notice portion of his motion and set a briefing schedule.  ECF No. 11.

[3] ECF No. 70.  He has also filed a separate motion to prod the court for a decision on his motion for leave.  ECF No. 71.  This order moots Peck's Motion to Proceed with Amended Complaint.

Peck has stated a colorable First Amendment claim for the remaining provisions, I find that he is not entitled to injunctive relief because these laws are content-neutral and narrowly tailored to serve a significant government interest.  Accordingly, I grant Peck's motion for temporary injunctive relief from the registration requirement, but I deny this motion in all other respects.  I then deny Peck's ex parte motion for leave to file a second amended complaint because he has not shown that leave is warranted, particularly on an ex parte basis.[4]

## Background

In 1995 upon finding that there "had been a progressive decline in the economic growth and vitality of business located in the central business district of the City [that] is attributable to the decrease in tourists and other visitors to the central business district,"[5] the City of Las Vegas adopted ordinances under Nevada's Pedestrian Mall Act[6] to close part of the historic Fremont Street and convert it into a pedestrian mall (the Mall).[7]  The ordinances are codified in Chapter 11.68 of the Las Vegas Municipal Code, govern activities on the Mall, and delegate certain responsibilities for and powers over the Mall's operations to The Fremont Street Experience, LLC (FSE).[8]

Since its adoption, Chapter 11.68 has been reshaped by litigation and compromises between the City, the FSE, and the American Civil Liberties Union of Nevada (ACLU).[9]

---

[4] This order moots Peck's motion to proceed.  ECF No. 71.

[5] LAS VEGAS MUNI. CODE § 11.68.010(A).

[6] NEV. REV. STAT. §§ 268.810 et seq.

[7] LAS VEGAS MUNI. CODE §§ 11.68.010 et seq.

[8] *Id.* at § 11.68.070.

[9] *See e.g. American Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092 (9th Cir. 2003) *cert. denied*, 540 U.S. 1110 (2004) ("*ACLU I*"); *American Civil Liberties Union of Nev. v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006) ("*ACLU II*"); *American Civil Liberties Union of Nev. v. City of Las Vegas*, No. 2:97-cv-01419-DAE-LRL (D. Nev. Oct. 24, 2011) (case closed upon parties' settlement).

2

Provisions governing the activities of street performers on the Mall were added to Chapter 11.68 by Ordinance No. 6131 in 2011.  The most recent amendments to Chapter 11.68 included changes to the provisions governing street performers and were implemented by Ordinance No. 6462, which took effect on November 1, 2015.[10]

Bruce Peck is a street performer who has worked in Las Vegas since October 2010.[11] Peck challenges the following provisions of Chapter 11.68 (as enacted in 2011 and amended in 2015) that govern the activities of street performers on the Mall:

1.    LVMC § 11.68.107(C)(2) prohibits street performances within certain areas;

2.    LVMC § 11.68.107(C)(5) limits the sound that street performers can emit;

3.    LVMC § 11.68.108(A), (B) designate certain zones where street performances are permitted from 3 p.m. to 1 a.m.;

4.    LVMC § 11.68.108(D) allows for the establishment of a lottery system for street performers to reserve the designated performance zones; and

5.    LVMC § 11.68.108(E) requires street performers to register with the City's Business Licensing Division within 72 hours after first using a designated performance zone.[12]

---

[10] ECF No. 5 at 45.

[11] ECF No. 20 at 2, 4–5, ¶¶ 2, 17.

[12] The City is correct that Peck does not specify in his motion for temporary injunctive relief which restrictions he is challenging, but these are the five restrictions that Peck most focuses on in his amended complaint, ECF No. 20 at 5–9, ¶¶ 19–39, and also in the reply in support of his motion for temporary injunctive relief.  ECF No. 40 at 5, ¶ 13.  Peck also alleges that Chapter 11.68 prohibits street performances during the celestial-vault-light show, ECF No. 20 at 10, ¶ 43, but I could not find that prohibition in either the 2011 or 2015 amendments.  Peck further alleges that Chapter 11.68 prohibits anyone from taking a seated position anywhere on the Mall, *id.* at 11, ¶ 48, but the 2011 amendments are silent on this issue, and the 2015 amendments allow street performers to sit on the Mall in the case of an emergency, upon approval in connection with events conducted by or on behalf of the FSE, or when done as part of a street performance.  Las Vegas Muni. Code § 11.68.100(B)(10) (2015).  Peck additionally alleges that the 2015 amendments ban "dangerous objects" but do not define that term, ECF No. 20 at 11, ¶ 50–51; however, "dangerous objects" is not used anywhere in the 2015 amendments.  Peck finally

**Discussion**

**A.      Motion for Temporary Injunctive Relief**

Injunctive relief is an extraordinary remedy that is awarded only upon a clear showing that the moving party is entitled to that relief.[13]  The legal standard for issuing a temporary restraining order and the legal standard for preliminary injunctive relief are "substantially identical."[14]  In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court clarified that the standards "require[ ] a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"[15]  But "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that [his] First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction."[16]  This is because the government "bear[s] the burden of proving the constitutionality of the ordinances at issue."[17]

---

alleges that the 2015 amendments prohibit street performances within 100 feet of a stage when a "sponsored concert" is in progress but do not define that term, *id.* at 16, ¶¶ 71–72; however, that term is defined in the 2015 amendments to mean "a concert or performance that is provided by or on behalf of the [FSE] and takes place on one of the permanent stage structures within the Pedestrian Mall."  LAS VEGAS MUNI. CODE § 11.68.020 (2015).  Because these claimed restrictions do not appear to exist, I limit my analysis of Peck's motion to the five restrictions initially identified above.

[13] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[14] *See Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

[15] *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

[16] *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011).

[17] *See Lone Star Sec. & Video v. City of Los Angeles*, — F.3d —, 2016 WL 3632375, at *3 (9th Cir. July 7, 2016) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)).

4

My analysis of the merits of Peck's motion begins and ends with the first *Winter* factor—likelihood of success on the merits—because the other factors hinge on its outcome.[18] However, I must first address whether Peck has standing to challenge each of these five provisions, and I thereafter address the City's argument that Peck's motion is not supported by evidence, i.e., that he has not stated a colorable First Amendment claim.[19]

### 1.    Peck lacks standing to challenge the sound restriction.

"Generally, in order to have standing and satisfy Article III's case or controversy requirement, a plaintiff must show that he has suffered an injury in fact, that the injury is traceable to the challenged action of the defendant[,] and that the injury can be redressed by a favorable decision."[20]  "[A] plaintiff may have standing to challenge some provisions of a law, but not others."[21]  "[T]he plaintiff may meet constitutional standing requirements by 'demonstrat[ing] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'"[22]  "To show such a 'realistic danger,' a plaintiff must 'allege[ ] an

[18] *See Kroll v. Incline Village Gen. Imp. Dist.*, 598 F. Supp. 2d 1118, 1126 (D. Nev. 2009) (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002)) (collecting cases and explaining that "in a First Amendment context," the plaintiff "'can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim[,]'" the government has "no legitimate interest in enforcing an unconstitutional ordinance, nor would enforcement of such an ordinance be in the public interest").

[19] ECF No. 32 at 14–15.  The City itself did not file a response to Peck's motion but instead joined in and adopted the now-former defendants Robert Gallego, Mark Brandenburg, and the Members of the FSE security staff's response.  ECF Nos. 32 (response), 33 (City's joinder).

[20] *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[21] *Id.* (citing *4805 Convoy, Inc. v. San Diego*, 183 F.3d 1108, 1112–13 (9th Cir. 1999)).

[22] *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder.'"[23]

Peck provides no evidence or even allegation that he has or intends in the future to emit sound as part of his street performances, let alone sound in excess of the maximum levels prescribed by the ordinance.[24] Peck instead alleges that he performs on the Mall as a "living statue"[25]—a type of performance that is inherently silent. I find that Peck has "failed to make a clear showing of a specific and concrete threat that" LVMC § 11.68.107(C)(5)'s limitations on the level of sound that street performers can emit would be enforced against him,[26] and I thus conclude that he lacks standing to challenge this provision.

### 2.   *Peck has stated a colorable First Amendment claim against the remaining four challenged restrictions.*

"Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for preliminary injunction."[27] A verified complaint can serve as an affidavit for temporary injunctive relief if "it is based on personal

---

[23] *Id.* (quoting *Babbitt*, 442 U.S. at 298).

[24] The ordinance prohibits street performers from exceeding 85 dBA when measured at 25 feet from the source of the sound and 107 dBA when measured at 1 foot from the source.

[25] *See* ECF No. 20 at 5, ¶ 17. It appears that Peck has also performed in other cities as a living statue. *See* ECF No. 32-1 at 3, ¶¶ 6–11 (Peck alleged in his complaint against the City of Boston that, "In the summer of 2008, [he] performed as a human statue, namely, a golden cowboy. He wore a golden outfit and painted his skin gold. As part of his act, he struck various poses for the crowd's enjoyment.").

[26] *See Lopez*, 630 F.3d at 794.

[27] 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2949 (2013).

6

knowledge" and "sets forth the requisite facts with specificity."[28]  A complaint is "verified" if it contains a sworn verification or declares that it is true and correct.[29]

Peck did not submit any evidence with his four-page motion, and although he did verify the truth of the contents of that motion in substantial compliance with the requirements of 28 U.S.C. § 1746,[30] he did not set forth any facts relevant to his request for temporary injunctive relief in it.[31]  Peck's amended complaint suffers from the reverse problem: it appears to be based on personal knowledge and sets forth requisite facts with specificity, but it does not contain a sworn verification or language that could be construed as substantially complying with 28 U.S.C. § 1746's requirements.[32]

Peck argues that I should ignore these infirmities because he is representing himself and, "particularly in civil rights cases" like this, courts are to "'construe'" pro se filings "'liberally and to afford the [pro se plaintiff] the benefit of any doubt.'"[33]  But construing a pro se filing to mean something more technical or precise than what the words say is quite different from what Peck asks me to do: read into his pleading a concept that is absolutely omitted from it—verification that his factual allegations are true and correct.  Peck's pro se status does not excuse him from the basic procedural requirement that his motion must be supported by some evidence.  I do not,

---

[28] *C.f. Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1176 (9th Cir. 2007), *abrogated on other grounds by John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) (quotation omitted; discussing that a verified complaint serves as an affidavit in the summary-judgment context).

[29] *Kerwin v. Remittance Assistance Corp.*, 559 F. Supp. 2d 1117, 1122 (D. Nev. 2008) (citing *Cal. Pro-Life Council, Inc.*, 507 F.3d at 1176; 28 U.S.C. § 1746).

[30] *See* ECF No. 7 at 4.

[31] *See generally* ECF No. 7.

[32] *See generally* ECF No. 20.

[33] *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1027 n. 1 (9th Cir. 1985) (en banc)).

therefore, consider the factual content of Peck's amended complaint for the purposes of his injunctive-relief request.

Peck did, however, set forth some facts with specificity in his reply, and its contents are verified in substantial compliance with the requirements of 28 U.S.C. § 1746,[34] so I consider those facts when deciding his motion. Those facts include that, as a result of the restrictions, Peck's "working hours have been drastically reduced[,]"[35] he has been threatened with and actually issued criminal citations for being outside of a designated performance zone,[36] and he has not and does not want to participate in the lottery for the performance zones.[37] Other evidence supports Peck's unverified allegations that he is a long-time street performer who routinely performs on the Mall.[38] I conclude that, although slim, there is sufficient factual detail in the record to find that Peck has made a colorable claim that his First Amendment rights have been infringed by: (1) LVMC § 11.68.107(C)(2)'s prohibition against street performances within certain areas of the Mall; (2) LVMC § 11.68.108(A), (B)'s designation of certain zones as the only locations on the Mall where street performances are permitted during 3 p.m. and 1 a.m.; (3) LVMC § 11.68.108(D)'s establishment of a lottery system for street performers to reserve the designated performance zone; and (4) LVMC § 11.68.108(E)'s requirement that street performers register with the City's Business Licensing Division within 72 hours after first using a designated performance zone.

---

[34] *See* ECF No. 40.

[35] *Id.* at 8, ¶ 18. I infer from this statement that the challenged ordinances have prevented Peck from performing on the Mall with the same frequency or at the same time or locations that he performed at before the street-performer restrictions were first enacted in 2011.

[36] *Id.*

[37] *Id.* at 5–6, ¶¶ 18, 23.

[38] ECF No. 32-1 at 55, ¶ 15 (FSE security and parking director declaring that "Peck has been observed performing on the Mall on multiple occasions").

1          ***3.    Reasonableness of the challenged restrictions***

2         The Ninth Circuit has already determined that the Mall is a traditional public forum.[39]

3 "Although regulation of speech in a traditional public forum is disfavored, it is not

4 impermissible.  The government may place reasonable time, place, and manner restrictions on

5 speech."[40]  But the restrictions "must be content-neutral and narrowly tailored to serve a

6 significant governmental interest, leaving open ample alternative channels of expression."[41]

7 "'The failure to satisfy any single prong of this test invalidates the requirement.'"[42]

8              *a.    The challenged restrictions are content-neutral.*

9         "'The principal inquiry in determining content neutrality, in speech cases generally and in

10 time, place, or manner cases in particular, is whether the government has adopted a regulation of

11 speech because of disagreement with the message it conveys.  The government's purpose is the

12 controlling consideration.'"[43]  "'Government regulation of expressive activity is content neutral

13 so long as it is *justified* without reference to the content of the regulated speech.'"[44]  An

14 ordinance is "content-based if either the main purpose in enacting it was to suppress or exalt

15 speech of a certain content, or it differentiates based on the content of the speech on its face."[45]

16         Chapter 11.68's findings explain that the Mall was created "for the movement, safety,

17 convenience, enjoyment, entertainment, recreation[,] and relaxation of pedestrians. . . ."[46]  The

---

19 [39] *ACLU II*, 466 F.3d at 789 (quoting *ACLU I*, 333 F.3d at 1094).

20 [40] *Id.* at 792.

21
22 [41] *Id.* (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

23 [42] *Id.* (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir. 1994)).

24 [43] *Id.* at 793 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

25 [44] *Id.* (quoting *Ward*, 491 U.S. at 791) (internal quotation marks omitted).

26 [45] *Id.* (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429–30 (1993)).

27
28 [46] LAS VEGAS MUNI. CODE §§ 11.68.010(A), (D) ("Prior to the Mall's creation, the former
Fremont Street area had become known as unseemly and crime ridden, with tourists and

Mall's "principal purpose" "is to serve as an economic and entertainment venue that will enhance the historical cental business district."[47]  Chapter 11.68 was amended in 2011 "to facilitate and enhance the Mall's purpose."[48]  And when "the Mall's environment and function . . . deteriorated" after the 2011 amendments, Chapter 11.68 was again amended in 2015 to assuage "confusion as to where expressive activity is appropriate, particularly activity engaged in by street performers, and to combat infighting and competition for the most desirable locations, [and] to enhance assess for all desired users of the Mall, including those seeking to engage in expressive activity. . . ."[49]  Peck submits no argument or evidence to refute these findings, and I accept them as evidence of the City's purpose in enacting—and later amending—the challenged ordinances.  These findings do not reflect that the City intended to suppress or exalt speech of a certain content.  Thus, I find that the purpose of the challenged restrictions is content-neutral.

Each ordinance that Peck challenges governs the activities of street performers on the Mall.  Chapter 11.68 defines a "street performer" to mean any person who, on the Mall, "engages in any form of performing art, including but not limited to posing, acting, dancing[,] or miming, whether in costume or not; the playing of any musical instrument, singing or vocalizing, with or without accompaniment, where the performing art is not provided by or on behalf of [FSE]."[50]  "The term 'street performer' includes persons commonly referred to as 'buskers' or those who engage in 'busking' activities."[51]  On their face, the challenged provisions regulate a certain manner of expression or expressive conduct—street performances.  But the ordinances do not

---

businesses leaving the area for a more hospitable environment.  The Pedestrian Mall was created to reverse that declining environment, and provide a safe and enjoyable entertainment experience to attract tourism and thereby support surrounding economic growth.").

[47] *Id.* at § 11.68.010(D).

[48] *Id.* at § 11.68.010(E).

[49] *Id.* at § 11.68.010(F), (G).

[50] *Id.* at § 11.68.020.

[51] *Id.*

distinguish based on the content of the message conveyed by the performers.  Nor do any of the

challenged provisions prohibit or restrict street performers from communicating a particular set

of messages.  The Supreme Court and the Ninth Circuit have both found that ordinances that

similarly regulate "certain *manner* of expression or expressive *conduct* [are] content-neutral."[52]

Following their reasoning, I find that these challenged restrictions are likewise content neutral on

their face.  And because the challenged restrictions are content neutral, the next question I must

address is whether they are narrowly tailored to serve a substantial governmental interest.

> ### b.   *Narrow tailoring*

"A narrowly tailored time, place, or manner restriction on speech is one that does not

'burden substantially more speech than is necessary' to achieve a substantial government

interest."[53]  "It must target[ ] and eliminate[ ] no more than the exact source of the 'evil' [that] it

seeks to remedy."[54]  And "although the chosen restriction 'need not be the least restrictive or

least intrusive means' available to achieve the government's legitimate interests, the existence of

obvious, less burdensome alternatives is a 'relevant consideration in determining whether the

"fit" between ends and means is reasonable.'"[55]

The City's findings stated in Chapter 11.68 and the declarations of Mark Brandenburg,

Interim Chairman of the FSE, and Robert Gallego, director for security and parking for the FSE,

tell the narrative of the City's interest and concerns that the street-performer-specific provisions

were drafted (and then amended) to combat.  The City's findings state that the restrictions

promote "the movement, safety, convenience, enjoyment, entertainment, recreation[,] and

---

[52] *ACLU II*, 466 F.3d at 794–95 n. 11 (collecting cases).

[53] *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (quoting *Ward*, 491 U.S. at 799).

[54] *Id.* (quoting *Frisby v. Schultz*, 487 U.S 474, 485 (1988)) (internal quotation marks omitted).

[55] *Id.* (quoting *Ward*, 491 U.S. at 798; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 3 (1993)).

relaxation of pedestrians" on the Mall.[56]  Following the 2011 amendments, the City found that

"the Mall's environment and function ha[d] deteriorated."[57]  "The 2011 amendments principally

imposed various distance restrictions from specific uses where expressive activity could occur."[58]

But because of the "Mall's congested nature," it appeared that the bare distance regulations

"created uncertainty among the general public and thus have led to confusion as well as in-

fighting as to where expressive activity may or may not occur."[59]

> Indeed, **the environment of the Pedestrian Mall has become
> such that certain persons or groups have attempted to
> monopolize certain locations, have been the recipients of
> threats and other forms of intimidation in an attempt to
> control certain areas where expressive activity is presently
> allowed.**  Unfortunately, the 2011 amendments have facilitated an
> inhospitable environment that is incompatible with the Mall's
> entertainment and commercial purposes, **and has further resulted
> in a deterioration of public safety and well-being.**[60]
>
> Considering the confusion as to where expressive activity is
> appropriate, particularly activity engaged in by street performers,
> and **to combat infighting and competition for the most
> desirable locations, to enhance access for all desired users of
> the Mall**, including those seeking to engage in expressive activity,
> **the City determines that is necessary and appropriate to create
> designated areas for the activities of street performers during
> peak hours of the mall's usage and to further ensure that no
> one is permitted to monopolize or use those locations to the
> exclusion of others.**[61]

Brandenburg explains that "[t]he absence of designated performance areas . . . created a

great deal of pedestrian traffic congestion on the Mall[,] . . . which is narrow at only 80[-]feet

wide in most places[ ] [and] is often filled with thousands of visitors who are struggling to move

---

[56] LAS VEGAS MUNI. CODE § 11.68.010(A).

[57] *Id.* at § 11.68.010(F).

[58] *Id.*

[59] *Id.*

[60] *Id.* (emphasis added).

[61] *Id.* at § 11.68.010(G) (emphasis added).

12

from place to place."[62]  The "[s]treet performers naturally position themselves strategically to maximize the traffic that passes by."[63]  But because "[c]ompeting street performers positioned themselves in the same area," they "creat[ed] clusters of street performers vying for the same traffic and attention."[64]  **"This created congestion that slowed pedestrian traffic to a crawl, similar to a freeway traffic jam.  In these instances, visitors had great difficulty navigating the Mall**. . . ."[65]  Brandenburg recounts that "there were numerous incidents between 2011 and 2015 in which street performers "got into arguments[,]" "bullied[,] and "became violent" with one another.[66]  Street performers claimed certain locations on the Mall as their own to the exclusion of others.[67]  And "[t]his dynamic created a toxic environment on the Mall."[68]

Brandenburg details how the bare exclusion zones impacted the retail vendors on the Mall: a street performer might be in compliance with the restriction that he perform 10 feet away from a kiosk, but the performer's crowd often "pushed up against retail kiosks" and that made their operators "particularly vulnerable to shoplifting, which happened often."[69]  He also recounts the worst street-performer behavior that Mall visitors encountered: harassment to pay for the performances that included holding a child hostage until the father could take money from an ATM to pay the amount demanded by the performer and firing a taser on a Mall visitor who

---

[62] ECF No. 32-1 at 15, ¶ 19.

[63] *Id.*

[64] *Id.*

[65] *Id.* (emphasis added).

[66] *Id.* at 15, ¶ 20.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 15–16, ¶ 21.

refused to pay the performer's money demand.[70]  Brandenburg explains that Mall visitors are more vulnerable to harassment and criminal conduct by aggressive street performers because "many Mall visitors are under the mistaken belief that street performers are either employed by or approved or authorized in some way by [the] FSE."[71]  Gallego mirrors all of Brandenburg's statements.[72]

The evidence thus shows that, after the creation of the Mall and substantial investment by the FSE[73] revitalized the Fremont street area and businesses and visitors returned, it also became a desirable location for people who wanted to engage in free-expression activities like street performing.  But the City and the FSE encountered serious problems with maintaining safety, order, and the free flow of pedestrian traffic on the Mall.  This appears to be largely due to the vast number of street performers who were drawn to the Mall.  Successful street performances draw crowds, and even unsuccessful ones pose as obstacles to or cause alterations in the natural flow of pedestrian traffic.  Clusters of performers exacerbate this problem.  The increase in this form of expression, combined with the fact that the Mall consists of a narrow, five-block street that is largely enclosed on top with an enormous video display; contains two permanent stages, a zip-line structure, and retail kiosks; is lined by numerous casinos and other establishments; and is often congested with the many visitors who come to experience this uniquely Las Vegas spectacle,[74] proved to be unworkable for all.  Visitors and retail operators complained about the performers, the performers complained about each other, and security spent an inordinate amount

---

[70] *Id.* at 16, ¶ 22.

[71] *Id.* at 16, ¶¶ 23, 25.

[72] *Id.* at 52–55.

[73] The FSE spent $70 million to build the Mall in 1994–95 and has since expended tens of millions of dollars in upgrades, operation, management, marketing, entertainment, and security costs.  ECF No. 32-1 at 13–14, ¶¶ 11–12.

[74] The FSE purports on its website that the Mall "welcomes more than 17 million visitors each year."  *See* http://vegasexperience.com/about-us/ (last accessed Sept. 1, 2016).

of time policing the performers.  Thus, the City took action by amending Chapter 11.68 in 2011 and again in 2015 to specifically address the problems that it and the FSE had in ensuring public safety, order, and traffic-flow as a result of the increase in street performances on the Mall.

The City first attempted to alleviate those problems by establishing buffer zones where street performances were prohibited around the pedestrian ingress, egress, and stopping points like building entrances, ATMs, retail kiosks, outdoor dining areas, fire lanes and crosswalks, and stages.[75]  But the bare "distance separations [ultimately] proved to be effectively impossible to enforce[,]" "particularly during peak traffic periods (nights, weekends, and holidays)[,]" and "[i]n nearly every instance" where a street performer who was in violation was asked to comply, "the street performer complied temporarily by moving a few feet, but then often returned to his/her unlawful spot the moment the FSE security guard was no longer observing the street performer."[76]

So, the City consulted and worked with the FSE and the ACLU to amend Chapter 11.68 with additional time, place, and manner restrictions to address the street-performer-specific problems.  The City Council unanimously approved the 2015 amendments that: (1) designated no fewer than 38 individual six-foot diameter zones (and one large, multi-person zone) on the Mall as the only places where street performances can be conducted from 3 p.m. to 1 a.m.; (2) established a lottery system for street performers to reserve the individual performance zones during those hours; and (3) required street performers to register with the City in order to participate in the lottery for the individual performance zones.  The buffer zones remained following the 2015 amendments, but an additional zone—40 feet from any other street performer then performing—was added, and the zone around the stages during concerts was reduced from 200 to 100 feet.

---

[75] LAS VEGAS MUNI. CODE § 11.68.107(C).

[76] ECF No. 32-1 at 14, ¶¶ 14–15.

1

*1.     Buffer zones*

2     The Supreme Court reiterated in *McCullen v. Coakley* that "'ensuring public safety and

3     order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property

4     rights'" are legitimate government interests.[77]  It found that the buffer zones at issue in that case

5     "clearly serve these interests."[78]  Peck argues that *McCullen* stands for the proposition that

6     exclusion zones are per se unconstitutional.[79]  But the Supreme Court's holding in *McCullen*

7     does not sweep so broadly.

8     *McCullen* concerns "[a] Massachusetts statute [that] ma[de] it a crime to knowingly stand

9     on a 'public way or sidewalk' within 35 feet of an entrance or driveway to any place, other than a

10    hospital, where abortions are performed."[80]  McCullen and her co-petitioners, "individuals who

11    approach and talk to women outside such facilities, attempting to dissuade them from having

12    abortions[,]" challenged the buffer zones on First Amendment grounds, arguing that they prevent

13    them from providing counseling near the facilities' entrances.[81]  The Court found that "the buffer

14    zones impose serious burdens on the petitioners' speech" because they "carve out a significant

15    portion of the adjacent public sidewalks, pushing petitioners well back from the clinics'

16    entrances and driveways.  The zones thereby compromise petitioners' ability to initiate the close,

17    personal conversations that they view as essential to 'sidewalk counseling.'"[82]  The Court

18    recounted more narrow means that Massachusetts could employ to serve its interests,[83] and

19

20
21    [77] *McCullen v. Coakley*, — U.S. —, 134 S.Ct. 2518, 2535 (2014) (quoting *Schneck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 376 (1997)).

22    [78] *Id.*

23    [79] ECF No. 40 at 6, ¶ 15.

24
25    [80] *McCullen*, 134 S.Ct. at 2525.

26    [81] *Id.*

27    [82] *Id.*

28    [83] *Id.* at 2537–39.

1  concluded that, instead of pursuing those more narrow means, "the Commonwealth has
2  pursued those interests by the extreme step of closing a substantial portion of a traditional public
3  forum to all speakers."[84]

4      *McCullen* does not demand that I find Chapter 11.68's buffer zones to be invalid time,
5  place, and manner restrictions.  And it is materially distinguishable because it concerned normal
6  conversations, not street performances.  The Court explained that, "while the First Amendment
7  does not guarantee a speaker the right to any particular form of expressions, some forms—such
8  as normal conversation and leafletting on a public sidewalk—have historically been more closely
9  associated with the transmission of ideas than others."[85]  The statute in *McCullen* also burdened
10  much more speech than the problem it sought to address.  The Massachusetts statute made it a
11  crime to knowingly stand on a public way or sidewalk within 35 feet of an entrance or driveway
12  to any place, other than a hospital, where abortions are performed, but the problem that it sought
13  to control arose "only once a week in one city at one clinic. . . ."[86]  Chapter 11.68's buffer zones,
14  however, are limited to areas of the Mall and directed at the only form of expression that the City
15  and the FSE had determined was the source of the problems—street performances.

16      Peck recommends that a reasonable alternative to the buffer zones would be to modify
17  each of them to only 10 feet.[87]  Two of the buffer zones are already 10 feet: around retail kiosks
18  or carts[88] and the outer perimeter of outdoor dining areas while in use for dining.[89]  Although the
19  remainder of the zones are larger, they are still modest: 20 feet from any building entrance, ATM,

20

21

---

22  [84] *Id.* at 2541.

23  [85] *Id.* at 2536.

24  [86] *Id.* at 2539.

25  [87] ECF No. 20 at 18, ¶ 81.

26

27  [88] LAS VEGAS MUNI. CODE § 11.68.107(C)(2)(b).

28  [89] *Id.* at § 11.68.107(C)(2)(c).

fire lane, or crosswalk[90]; 40 feet from any other then-performing street performer[91]; 100 feet from the stage during a sponsored concert[92]; any area of the Mall that is closed to the public[93]; and any location that will obstruct or impede pedestrian traffic.[94]  I cannot conclude on this record, like the Court did in *McCullen*, that the buffer zones that exceed 10 feet "carve out a significant portion of the adjacent" Mall, nor that they push street performers "well back" from the very areas in which they want to perform.

The City's reasons for establishing the buffer zones—ensuring public safety and order and the free flow of pedestrian traffic on a congested pedestrian mall—are substantial government interests.  The buffer zones target only street performances, a form of expression that inherently poses as an obstacle to or alters the natural flow of pedestrian traffic, which itself can cause public-safety and traffic-flow concerns.  I find that the buffer zones eliminate "no more than the exact source of the 'evil' [that] [they] seek[ ] to remedy."[95]  The buffer zones also target only those areas of the Mall that are (or are closely adjacent to) typical pedestrian ingress, egress, and stopping areas.  Thus, I conclude that the City has shown that the buffer zones are narrowly tailored place-and-manner restrictions that do not burden substantially more speech than is necessary to achieve a substantial government interest.

## 2.     *Performance zones and the lottery system to use them*

The City has now designated certain locations as the only places on the Mall where street performances can be conducted from 3 p.m. to 1 a.m., which consist of: (1) the portion of the Mall that formerly consisted of Third Street (crossing perpendicular over Fremont street) and (2)

---

[90] *Id.* at § 11.68.107(C)(2)(a), (d).

[91] *Id.* at § 11.68.107(C)(2)(g).

[92] *Id.* at § 11.68.107(C)(2)(f).

[93] *Id.* at § 11.68.107(C)(2)(e).

[94] *Id.* at § 11.68.107(C)(2)(h).

[95] *Berger*, 569 F.3d at 1041 (quoting *Frisby*, 487 U.S. at 485) (internal quotation marks omitted).

"[o]ther areas, each of which is no greater than six feet in diameter and is denoted on the surface of the Pedestrian Mall."[96]  The "other areas" are the focus of Peck's complaint and motion.  As for those areas, "no fewer than thirty-eight" of them must be provided, of which "no fewer than twenty-five" must be "available at any given time."[97]  Each zone is available on a first-come-first-served basis except when it has been assigned to a particular performer under the lottery system that the 2015 amendments authorized either the City of the FSE to establish.[98]  Under the lottery system, no performer can use a particular zone for more than two hours at any time and must switch to a new location at the top of each odd-numbered hour during the hours of 3 p.m. and 1 a.m.[99]  "No street performer may perform within a designated location within the specified time frame unless: (1) [h]e or she has been allotted that location for that time; or (2) [n]o one has been allotted that location for that time."[100]

Peck alleges that these restrictions give the FSE too much discretion in determining the location of the performance zones, deprive street performers of the right to choose where to conduct their performances,[101] and do not establish a clear procedure for how performers are assigned the spaces or how performers are to determine which spaces to move to after the mandated time period has elapsed.[102]  I first address Peck's argument that the restrictions give the FSE too much discretion in determining the location of the performance zones.

A fair reading of the ordinance discloses that it does not provide the FSE too much leeway in setting the location of the performance zones.  The ordinance states that "[a] map

---

[96] LAS VEGAS MUNI. CODE § 11.68.108(A).

[97] *Id.* at § 11.68.108(B).

[98] *Id.* at § 11.68.108(C).

[99] *Id.* at § 11.68.108(D).

[100] *Id.*

[101] ECF No. 20 at 8–9, ¶¶ 34–39.

[102] *Id.* at 7–8, ¶¶ 27–33.

1  depicting the approximate locations of the designated locations . . . shall be on file with the City

2  Clerk, **is hereby incorporated by this reference,** and shall be made available for inspection

3  during normal business hours."[103]  A map of where the performance zones are located is also

4  available on the City's website.[104]  The City's online map shows that the performance zones are

5  staggered along the entire length of the five-block Mall.  The ordinance continues, "In the

6  exercise of its authority under this Chapter, or in order to facilitate the flow of pedestrian traffic,

7  or to serve the convenience of the Pedestrian Mall's patrons (or any combination thereof), [t]he

8  [FSE] may adjust the exact location of any designated location . . . up to twenty-five feet in any

9  direction from the location appearing on the map. . . ."[105]  The plain language of the ordinance

10  precludes the FSE from doing what Peck fears: adjusting the spots so that they are literally

11  touching, bunching them all up, or relocating all of them to a "deadzone."  Thus, I do not find

12  that the ordinance grants the FSE too much discretion regarding the location of the zones.

13       I also do not find that the ordinance is unconstitutionally vague because it fails to

14  delineate every detail of the lottery procedure: the purpose of the ordinance was to authorize

15  either the City or the FSE to establish the procedure.  Moreover, the City has now done so and

16  explains on its website exactly how the procedure works:

17  Each Street Performer must register to be included in the lottery.  A
    Street Performer may register on-line at any time, in person on the
18  Fremont Street Pedestrian Mall during designated registration
    hours of 10:00 AM to 8:00 PM, or may register in person during
19  business hours at the City of Las Vegas DSC building located 333
    North Rancho Dr.
20
    A lottery will be run each day to assign registrants 38 designated
21  locations for the following day.  Not all designated locations may
    be utilized due to special events.  Time slots are designated to start
22  in 2 hour increments starting at 3:00 PM and ending at 1:00 AM.
    A new lottery with all participants will be run for each time
23

24

25  [103] LAS VEGAS MUNI. CODE § 11.68.108(B) (emphasis added).

26  [104] The City's "Performance Zones Map" is available at: www.lasvegasnevada.gov/portal/faces/
27  home/doing-business/db-business-licensing/db-street-performer (last accessed Sept. 1, 2016).

28  [105] LAS VEGAS MUNI. CODE § 11.68.108(B).

> segment.  It is possible that a participant may end up with back to back time slots or no time slots at all.
>
> To be included in the lottery a registrant must sign in between the hours of 10:00 AM and 8:00 PM the day before and opt in for time slots.[106]

The City has also made it possible for performers to verify online which spaces have been assigned under the lottery for a given day.[107]  The performance spaces are marked with either a number (1–27) or a letter (A–K).  And because the performers are assigned a number when they register to be included in the lottery, that number is what is listed under each performance zone on the Performer Schedule maintained by the City.

This leaves Peck's argument that these requirements are not valid time, place, or manner restrictions.  I disagree.  The City's reasons for establishing the performance zones and corresponding lottery for reserving them—ensuring public safety and order and the free flow of pedestrian traffic on a congested public Mall—are substantial government interests.  When bare buffer zones did not alleviate the problems that had been encountered with the increased number of street performances on the Mall like pedestrian harassment, congestion, navigation issues, bullying, in-fighting, monopolizing of areas, and territory disputes among the performers, the City (in conjunction with the ACLU and the FSE) went back to the drafting board and created performance zones to be used only during the most heavily trafficked times on the Mall and a lottery procedure for allotting each zone to a particular performer.  The City likely enacted this type of scheme because it recognized following *Berger v. City of Seattle*[108] that designated zones available on a first-come-first-served basis address the pedestrian harassment, congestion,

---

[106] The City's "Information on Registration Program" is available at: https://secure3.lasvegasnevada.gov/buskerpermit/Default.aspx (last accessed Sept. 1, 2016).

[107] The City's "View Schedule" is available at: https://secure3.lasvegasnevada.gov/ buskerpermit/SelectSchedule.aspx (last accessed Sept. 1, 2016).

[108] *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009).

1   and navigation problems but not the problems with bullying, in-fighting, monopolizing, and

2   territory disputes between the performers.[109]

3       In *Dowd v. City of Los Angeles*,[110] the Central District of California recently faced a

4   similar First-Amendment challenge to the designated-zone-and-permit scheme governing

5   activities on the Venice Beach Boardwalk.  The *Dowd* court explained that, "[u]nlike the

6   ordinance in *Berger*, the 2008 Ordinance was a space allocation system [that] assigned

7   performers to particular spots to effectively distribute the limited space of the Boardwalk."[111]

8       Like the scheme in *Dowd*, the designated-zone-and-lottery scheme in Chapter 11.68

9   likewise functions as an allocation system for the limited space that is available on the Mall, and

10   the performance zones "combined with the lottery system provide[ ] a mechanism for officers to

11   resolve disputes about space allocation in a neutral manner."[112]  And by similarly discouraging

12   performers from monopolizing or staking an early claim to a particular place, the Fremont

13   scheme "expand[s] the pool of potential performers to include speakers who might not assert

14   themselves in a first-come-first-served situation."[113]  "'[T]he regulation responds precisely to the

15   substantive problems [that] legitimately concern the'" City."[114]  The Fremont scheme is, in fact,

16   laser focused: it is utilized only during the Mall's peak attendance times (3 p.m. to 1 a.m.), and

17   its sole target is the street-performance form of expression.  Thus, I conclude that the designated

---

[109] *See id.* at 1041 ("There is, for example, no reason two street performers with permits would be less likely to engage in a territorial dispute than two street performers without permits.  After all, under the Rules, a permit does not entitle a performer either to a particular territory or to a particular time period within a given territory.").

[110] *Dowd v. City of Los Angeles*, CV 09-06731 DDP (SSx), 2013 WL 4039043 (C.D. Cal. Aug. 7, 2013).

[111] *Id.* at *8.

[112] *See id.*

[113] *See id.*

[114] *See id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297 (1984)).

performance zones and corresponding lottery system to use them are narrowly tailored time, place, and manner restrictions that do not burden substantially more speech than is necessary to achieve a substantial government interest.

    *3.    Performer registration to participate in the performance-zone lottery*

    Part and parcel of the performance-zone-and-lottery scheme is the requirement that street performers register with the City's Business Licensing Division (or its designee) after first using an individual performance zone. I find that this requirement is, in large part, a narrowly tailored time, place, and manner restriction for the same reasons that I found the performance-zone-and-lottery scheme to be valid. Additionally, the registration process itself is not onerous because registration can be done either online or in person at the Mall or at the City's government building. It is free, and the performers can register anonymously if they so choose—to register the performers are required to provide only a list of what characters or acts they intend to perform.[115] It also does not squash a person's ability to engage in a spontaneous performance because registration can be accomplished up to 72 hours *after* a performer has used one of the designated performance zones.

    However, I am concerned that, as written, the registration requirement is mandatory even on those performers who, like Peck, do not want to participate in the lottery but instead prefer to utilize a spot that has not been allotted under that system.[116] To the extent that it requires a lottery registration to use even those performance zones that are not allotted to a particular performer under the lottery for a given time— zones that LVMC § 11.68.108(D)(2) states are available to any performer—it operates as a prior restraint on speech.

---

[115] This requirement is aimed at enforcing the restriction that a performer is entitled to only one registration regardless of whether he has different performances or characters. LAS VEGAS MUNI. CODE § 11.68.108(E). The one-performer-one-registration requirement appears to be an effort to prevent a performer from gaming the system by having multiple registrations and thus increasing his odds of getting assigned multiple zones or a particular zone in the lottery.

[116] *See* LAS VEGAS MUNI. CODE § 11.68.108(E).

1     A prior restraint on speech is not unconstitutional per se, but it does come to court

2  "bearing a heavy presumption against its constitutional validity."[117]  I cannot conclude on this

3  record that the City has overcome that heavy presumption.  I find that Peck has a likelihood of

4  showing that the portion of LVMC § 11.68.108(E) that requires all performers to register for the

5  lottery scheme regardless of whether they want to participate in it burdens more speech than is

6  necessary to accomplish the City's legitimate ends.  Thus, I grant Peck's motion to the extent that

7  it seeks to enjoin the City from enforcing the registration portion of LVMC § 11.68.108(E).  The

8  practical result of this decision is that the City can continue to enforce the performance-zone and

9  lottery restrictions.  The City also may continue requiring those performers who want to

10  participate in the lottery to register in order to do so.  Registered performers who are assigned

11  performance zones in the lottery will continue to have priority to the zones that they have been

12  allotted.  But to the extent that a zone has not been allotted to any particular performer under the

13  lottery system, it is available on a first-come-first-served basis to any performer, regardless of

14  whether he has signed up for the lottery.  And no citation may be issued to a performer for failing

15  to sign up for the lottery.

16          c.    *Alternative channels of expression*

17          Performers are free to express themselves along the entire length of the Mall from 1:01

18  a.m. until 2:59 p.m. the next day.  Space is available during those times on a first-come-first-

19  served basis, and performers must simply stay outside of the buffer zones, which are (or are

20  directly adjacent to) typical pedestrian ingress, egress, and stopping points.  When the Mall

21  becomes more crowded with visitors (between 3 p.m. and 1 a.m.) performers are still free to

22  express themselves but must do so within one of the 25–38 individual, 6-foot diameter

23  performance zones that dot the length of the Mall, or they can perform in the larger former Third

24  Street zone.  Registered performers who are allotted an individual performance zone under the

25  lottery are given priority to the zone that they are assigned, but unallotted zones are available on a

26

27  ───────────────

[117] *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (quotation omitted;
28  collecting cases).

24

first-come-first-served basis to any performer.  With the caveat to the registration requirement discussed above, I find that the challenged restrictions, individually and as a scheme, leave open ample channels for expression.  So I deny the motion except as it relates to the registration requirement as explained in § (b)(3) *supra*.

### 4.    *Peck is not required to post a security bond.*

Rule 65 of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Peck, however, has been granted in forma pauperis status under 28 U.S.C. § 1915 and "permitted to maintain the action to conclusion without the necessity of prepayment and any additional fees, costs, or security."[118]  Thus, consistent with that order and the purpose of § 1915, I do not require Peck to post a bond to effectuate this order and restrain enforcement of the registration requirement.

### B.    Ex Parte Motion for Leave to File Second Amended Complaint

Peck also moves for leave to file a second amended complaint[119] and prods the court for a decision on that motion.[120]  Local Rule 7-2(d) provides that "[t]he failure of a moving party to include points and authorities in support of the motion constitutes a consent to denying the motion."  Peck does not include the authority that governs motions for leave to amend, nor does he explain why, under that authority, he should be allowed to amend his complaint for a second time or even the purpose for the requested amendment.[121]  This deficiency leaves me unable to fairly evaluate the merits of his leave request.

---

[118] ECF No. 4 at 6.

[119] ECF No. 70.

[120] ECF No. 71.  The more appropriate vehicle for Peck's request for a decision was a letter under LR IA 7-1, not a motion to proceed.

[121] *See generally* ECF No. 70.

1   Peck argues that he filed his motion on an ex parte basis—without notice to the

2   City—because he did not have "enough time to solicit leave from the City plus timely file."[122]

3   But Peck's timing concern was not an appropriate basis for seeking relief on an ex parte basis.[123]

4   If he was not able to obtain written consent from the City before the time to amend expired, then

5   he should have simply filed his motion in the ordinary course, not without notice to the City.[124]

6   These defects have left me unable to conclude that amendment is warranted, and I therefore deny

7   Peck's motion for leave to file a second amended complaint, mooting his motion to proceed.

8   Because the deadline to amend pleadings expired March 22, 2016, if Peck desires to reurge his

9   motion for leave to amend, he will also have to show good for reopening the amendment period

10  and good cause for the delay.[125]

## Conclusion

12  Accordingly, IT IS HEREBY ORDERED that **Peck's motion for a temporary**

13  **restraining order or preliminary injunction [ECF No. 7] is GRANTED in part and**

14  **DENIED in part.**   Until further order of this court, the City of Las Vegas including, without

15  limitation, all of its employees, servants, and other persons acting in concert or participation with

16  it who receive actual notice of this order are enjoined from enforcing the portion of LVMC §

17  11.68.108(E) that requires all performers to register for the performance-zone lottery regardless

18  of whether they want to participate in it, and are also enjoined from issuing citations to

19  performers who elect not to register for the lottery.  In all other respects, Peck's request for a

20  temporary restraining order or preliminary injunction is denied.

---

[122] ECF No. 70 at 1.

[123] *See Moore v. Chase, Inc.*, No. 1:14-cv-01178-SKO, 2015 WL 4636750, at * 3 (E.D. Cal. Aug. 3, 2015) ("'[e]x parte applications are not intended to save the day for parties who have failed to present requests when they should have'").

[124] *See* FED. R. CIV. P. 15(a)(2) (providing that "a party may amend its pleading only with the opposing party's written consent **or** the court's leave" (emphasis added)).

[125] *See* FED. R. CIV. P. 6(b)(1)(B) ("the court may, for good cause, extend the time on motion made after the time has expired if the party failed to act because of excusable neglect.").

1      IT IS FURTHER ORDERED that **Peck's ex parte motion for leave to file a second**

2  **amended complaint [ECF No. 70] is DENIED**, and his **motion to proceed with the second**

3  **amended complaint [ECF No. 71] is DENIED as moot.**

4      DATED:  September 6, 2016

5  

6  Jennifer A. Dorsey
   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28